**NATURAL RESOURCES DEFENSE COUNCIL, INC., Environmental Defense Fund, Inc., and Alan G. Hevesi, Plaintiffs,**

v.

**Jeanne FOX, Regional Administrator, United States Environmental Protection Agency, Region II, Carol Browner, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Defendants.**

No. 94 CIV. 8424(PKL).

United States District Court, S.D. New York.

Nov. 12, 1998.

Natural Resources Defense Council, Inc., New York (Mark A. Izeman, Eric A. Goldstein, of counsel), for Plaintiffs.

Mary Jo White, United States Attorney Southern District of New York, New York (Manvin S. Mayell, of counsel), for Defendants.

### OPINION AND ORDER

LEISURE, District Judge.

This case involves the alleged failure for the past nineteen years of the State of New York to establish pollution limits, known as total maximum daily loads ("TMDLs"), for waterbodies in the State. Plaintiffs bring

this action against the United States Environmental Protection Agency and two of its administrators (collectively, "EPA"), pursuant to the Clean Water Act ("Act"), 33 U.S.C. §§ 1251, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 501, *et seq.*, alleging that in the face of New York State's failure to act, EPA has unlawfully failed to intervene and establish the TMDLs itself. Plaintiffs raise a number of other related claims, including that EPA has acted arbitrarily and capriciously regarding New York State's recent putative TMDL submissions for reservoirs supplying drinking water to New York City.

By Opinion and Order dated December 11, 1995, the Court ruled, *inter alia,* that (i) New York State's alleged failure to submit TMDLs could trigger nondiscretionary duties of EPA to intervene, and (ii) genuine issues of material fact exist as to whether certain of New York State's submissions to EPA constitute TMDLs, and, even if they do, whether EPA nonetheless must intervene. *See Natural Resources Defense Council, Inc. v. Fox,* 909 F.Supp. 153, 156–158 (S.D.N.Y. 1995) [hereinafter *"NRDC"*].

EPA now moves for judgment on the pleadings that EPA's duty to intervene is discretionary and that plaintiffs are, therefore, precluded from seeking to enforce that duty under either the Clean Water Act or the APA. Alternatively, EPA moves for summary judgment that EPA's duty, even if mandatory, need not be fulfilled because New York State has recently made progress in submitting TMDLs. EPA also seeks judgment on plaintiffs' other remaining claims.

For the reasons stated in this Opinion, EPA's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The Court presumes familiarity with the discussion of the Clean Water Act's statutory scheme in its previous decision in this action. *See NRDC,* 909 F.Supp. at 156–157. Accordingly, only those elements of the Clean Wa-

ter Act pertinent to the motion presently before the Court are set forth here.

The instant case involves Section 303(d) of the Clean Water Act, which regulates waterbodies failing to meet water quality standards even upon application of technological pollution controls. *See* 33 U.S.C. § 1313(d)(1)(A). States are required to create a prioritized list of such waterbodies, and, in accordance with the priority list, to establish TMDLs for each waterbody concerning pollutants specified by EPA. *See* 33 U.S.C. §§ 1313(d)(1)(A) & (C).

The Act sets forth a general directive as to the required components of a TMDL:

> Such load shall be established at a level necessary to implement the applicable water quality standards with seasonal variations and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality.

*Id.* § 1313(d)(1)(C). EPA regulations further provide that a TMDL shall consist of the sum of: (i) the loading allotments for existing and future point sources of pollution [1] (known as "wasteload allocations"), and (ii) the loading allotments for existing and future nonpoint sources of pollution and natural background sources of pollution (known as "load allocations"). *See* 40 C.F.R. §§ 130.2(e)-(i).

The Act provides that states "shall submit" the prioritized lists of waterbodies and accompanying TMDLs "from time to time, with the first such submission not later than one hundred and eighty days after" EPA identifies relevant pollutants. *See* 33 U.S.C. § 1313(d)(2).

Upon receipt of lists and/or TMDLs, EPA "shall either approve or disapprove [them] ... not later than 30 days after the date of submission." *Id.* § 1313(d)(2). Should EPA disapprove either a list of waterbodies or a TMDL,

> [it] shall not later than thirty days after the date of such disapproval identify such waters in such State and establish such loads for such waters as [it] determines

---

**1.** The Act defines a point source as "any discernible, confined and discrete conveyance ... from

which pollutants are or may be discharged." 33 U.S.C. § 1362(14).

necessary to implement the water quality standards applicable to such waters . . . .

*Id.*

Principally at issue in the instant case is New York State's alleged failure to submit TMDLs to EPA for review. The Clean Water Act does not expressly address what, if any, duty EPA has in that situation. *See id.* § 1313(d). Courts, including this Court, have read into the Act a requirement that EPA treat such state inaction as a so-called "constructive submission" of a deficient TMDL, triggering EPA's explicit mandatory duties under the Act to disapprove the "submission", *id.* § 1313(d)(2), and to establish TMDLs for the state, *id.* *See NRDC,* 909 F.Supp. at 157 (explaining doctrine and listing cases).

The remaining claims in the case, also addressed in this Opinion, concern EPA's treatment of New York State's 1997 submissions of putative TMDLs, and EPA's conduct in fulfilling its alleged general duty to "oversee and effectuate" implementation of § 303(d) of the Clean Water Act.

## DISCUSSION

### I. Failure to Deem New York State's Alleged Inaction a "Constructive Submission" of Deficient TMDLs

States' initial TMDLs and lists of waterbodies were due on June 26, 1979. *See NRDC,* 909 F.Supp. at 157. Plaintiffs allege New York State, despite this due date, neglected for almost two decades to submit any TMDLs to EPA for review. Plaintiffs further allege that following plaintiffs' initiation of the instant lawsuit, the State has made only token efforts to comply with its TMDL obligations. The State's alleged evasion of the Act's requirements should, according to plaintiffs, be deemed a "constructive submission" of deficient TMDLs to EPA, triggering EPA's duty to intervene and to promulgate the TMDLs. Plaintiffs contend EPA has failed to comply with these nondiscretionary duties in violation of the Clean Water Act and the APA.

EPA argues it is entitled to judgment on plaintiffs' claims under the Clean Water Act and APA because EPA's duty to intervene is

discretionary and, thus, may not be reviewed under either statute. In the alternative, EPA asserts it is entitled to summary judgment because New York State's recent submissions of TMDLs eliminate any arguably nondiscretionary duty of EPA to intervene. The Court considers EPA's arguments with respect to plaintiffs' Clean Water Act claim and APA claim, respectively.

### A. *Clean Water Act Claim*

EPA asserts its duty to intervene is discretionary and, therefore, cannot be enforced under the citizen suit provisions of the Clean Water Act. Plaintiffs respond that the law of the case embodied in the Court's previous decision in this action precludes EPA from raising its argument at this stage of the proceedings. Plaintiffs further contend that, in any case, EPA's intervention duty is mandatory.

Because the parties did not previously litigate the specific issue now raised by EPA and because that issue concerns the Court's jurisdiction to hear plaintiffs' claim under the Clean Water Act, the Court finds the law of the case doctrine does not preclude consideration of EPA's argument. Furthermore, upon consideration of EPA's argument, the Court finds it lacks subject matter jurisdiction over plaintiffs' claim under the Clean Water Act because EPA has discretion as to when to deem state inaction a "constructive submission".

#### 1. *Law of the Case*

■ The law of the case doctrine provides that "when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case." *United States v. Uccio,* 940 F.2d 753, 758 (2d Cir.1991). The doctrine seeks to ensure fair treatment of the parties and to promote judicial efficiency and finality of the proceedings by avoiding duplicative decisionmaking. *See County of Suffolk v. Stone & Webster Eng'g Corp.,* 106 F.3d 1112, 1117 (2d Cir.1997).

■ Generally, the presumption in favor of letting previous decisions stand may be overcome only by a compelling justification,

such as "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Doe v. New York City Dep't of Soc. Serv.,* 709 F.2d 782, 789 (2d Cir.), *cert. denied,* 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) (internal quotations and citation omitted). The law of the case doctrine is not, however, a mandatory rule of decision; instead, it "merely expresses a general reluctance, absent good cause, to reopen rulings that the parties have relied upon." *Tischmann v. ITT/Sheraton Corp.,* 145 F.3d 561, 564 (2d Cir.1998); *see also Sagendorf–Teal v. County of Rensselaer,* 100 F.3d 270, 277 (2d Cir.1996) ("the 'law of the case' doctrine is 'discretionary and does not limit a court's power to reconsider its own decision prior to final judgment.' ") (quoting *DiLaura v. Power Auth. of State of New York,* 982 F.2d 73, 76 (2d Cir.1992)).

█ The Court held in its previous decision in this action that state failure to establish TMDLs could be considered a "constructive submission" of deficient TMDLs, triggering mandatory duties of EPA to intervene. *See NRDC,* 909 F.Supp. at 157–60. In so holding, the Court relied on the decisions of several other courts adopting the "constructive submission" doctrine, in which those courts characterized EPA's duty of intervention as being mandatory. *See id.* at 157.

EPA contends the Court should nonetheless address the proper characterization of EPA's intervention duty because the issue has not actually been specifically litigated by the parties and because the issue directly concerns whether the Court has subject matter jurisdiction over plaintiffs' Clean Water Act claim.

The Court agrees with EPA. Although the Court's previous decision clearly presumed EPA's intervention duty is mandatory, *see id.* at 157–60, the Court did not directly assess whether characterization of the duty as such is legally correct. Thus, consideration of the issue at this juncture would not be an exercise in duplicative decisionmaking; nor would plaintiffs in any sense be robbed of a previous victory.

In addition, the Court finds that its manifest obligation to ensure it has subject matter jurisdiction over plaintiffs' Clean Water Act claim weighs in favor of considering EPA's contention. If EPA is correct that its duty is discretionary, then the Court would commit clear error if it allowed plaintiffs to proceed with their claim. *See* 33 U.S.C. § 1365(a)(2). It is best to consider the issue now, before further time and resources are expended by the parties.

Therefore, the Court finds the law of the case doctrine does not preclude the Court from considering whether EPA's duty is discretionary. The Court, therefore, proceeds to determine the nature of that duty.

### 2. Subject Matter Jurisdiction

█ Plaintiffs allege EPA has failed to perform duties prescribed by the Clean Water Act. The Act grants the Court subject matter jurisdiction over such a claim only to the extent

> there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator.

33 U.S.C. § 1365(a)(2).

EPA's duty to intervene under the "constructive submission" doctrine actually implicates three distinct duties of EPA: (i) a duty to deem state inaction a "constructive submission" of a deficient TMDL (referred to on occasion herein as a "deeming" duty); (ii) a duty to disapprove the "constructive submission"; and (iii) a duty to promulgate a TMDL.

EPA focuses on the first of these duties, arguing, in essence, that its decision when to deem state inaction a "constructive submission" is discretionary. EPA contends that it is for EPA to decide when a particular state is sufficiently delinquent so as to justify intervention, applying the agency's expertise as to the subjects addressed by the Act and more extensive knowledge of state compliance with the Act's TMDL program.

The Court agrees with EPA. As an initial matter, the Clean Water Act does not expressly require EPA to deem state inaction a "constructive submission" by any particular

date. Indeed, it is only by way of judicial gloss on the Act that EPA has been found to have any duty at all to deem state inaction a "constructive submission". *See NRDC,* 909 F.Supp. at 157. Thus, any deadline foreclosing EPA discretion to decide when intervention is appropriate would have to be inferred from the statute.

The only provision in the Act upon which such a deadline could be premised is the initial deadline for submission of TMDLs: June 26, 1979. *See id.* Failure by a state to submit a TMDL by that date might be construed to require EPA to deem any state inaction as of that time a "constructive submission". Alternatively, since deeming state inaction a "constructive submission" necessarily means EPA must disapprove the "constructive submission", the deadline for exercise of EPA's deeming duty could be considered the same as the deadline for EPA to disapprove initial TMDL submissions, *i.e.,* July 26, 1979. *See id.*

The Court is of the view, however, that neither date would be an appropriate deadline for EPA to intervene. First, imposing either of these deadlines on EPA would require the Court to infer such a date for an underlying duty that is itself not expressly set forth in the statute. Heaping inference upon inference to divine a precise date for exercise of an implied duty does not generally make for persuasive statutory construction. Moreover, such an exercise would make especially little sense (and, thus, be especially inappropriate) in this case because either deadline so derived would have expired long before courts first inferred from the statute that EPA even has a duty to intervene. *See NRDC,* 909 F.Supp. at 157 (listing cases). The Court notes in this regard that it is not aware of any case in which a court has held that EPA intervention regarding TMDLs must occur by a particular date. To the contrary, courts adopting the "constructive submission" doctrine have held that such a duty arises only after some prolonged and unquantified passage of time. *See, e.g., Scott v. City of Hammond,* 741 F.2d 992, 996 (7th Cir.1984) (duty exists where "state fails over a long period of time to submit proposed TMDLs"); *Sierra Club v.*

*Hankinson,* 939 F.Supp. 865, 868 (N.D.Ga. 1996) ("prolonged failure [to submit TMDL] may amount to ... 'constructive submission'").

Second, imposition of either deadline would necessarily be premised on the assumption that states were required to submit *all* TMDLs by June 26, 1979. Such an interpretation would completely ignore TMDLs properly submitted after expiration of the deadlines as a result of new additions of waterbodies to states' priority lists. There are likely to be many such additions, given states' ongoing assessment of waterbodies and the states' obligation periodically to review water quality standards. *See, e.g.,* 40 C.F.R. § 131.20(a) (requiring states to review water quality standards at least every three years).

Even as to TMDLs required for states' early lists of waterbodies (*e.g.,* prior to 1979), the statute imposes no drop-dead date for submission of all such TMDLs. Rather, the Act states that TMDLs are to be established "in accordance with the [state's] priority ranking" of affected waterbodies and shall be submitted to EPA from "time to time, with the first such submission not later than [June 26, 1979]". 33 U.S.C. §§ 1313(d)(1)(C) & (2). Those provisions appear to contemplate a process in which TMDLs are completed in order of priority; the "first ... submission" of completed TMDLs is to occur by June 26, 1979; and, as additional TMDLs are completed according to the priority ranking, they are to be submitted to EPA from "time to time". *Id.* To read the Act to require submission of all TMDLs for states' early waterbody lists by June 26, 1979, might well render the provision for establishment of TMDLs "in accordance with the priority ranking" of waterbodies nonsensical, given the very short time period in which all such submissions would be considered due.

Finally, even if either deadline could plausibly be inferred from the statute, the Court finds such an inference to be unwarranted because it would unduly limit EPA's flexibility in addressing TMDL compliance. Courts must be wary of infringing upon the deference due to administrative agencies, especially as regards implementation of a laby-

rinthine statutory scheme such as the Clean Water Act. In this case, at least some deference is due to EPA's superior knowledge of the problem of TMDL compliance and to the agency's need to allocate limited resources. The Court is persuaded by the statement of the United States Court of Appeals for the District of Columbia Circuit in an analogous situation:

> [the] inferrable deadline is likely to impose merely a 'general duty' of timeliness, one which does not result in *per se* violations, but instead requires assessment of both the need for 'quality' in the agency's actions and the 'burden' that compliance with the deadline would impose upon the agency. . . . In the absence of a readily-ascertainable deadline, therefore, it will be almost impossible to conclude that Congress accords a particular agency action such high priority as to impose upon the agency a 'categorical mandate' that deprives it of all discretion over the timing of its work.

*Sierra Club,* 828 F.2d at 791 (footnote omitted).

Thus, the Court finds that the Act does not provide any particular date by which EPA must intervene. Therefore, EPA has at least some discretion to determine at what point it is appropriate to deem state inaction a "constructive submission" meriting intervention. Accordingly, the Court lacks subject matter jurisdiction over plaintiffs' claim under the Clean Water Act, and EPA is entitled to judgment on the pleadings as to Claims 3 and 4 of plaintiffs' complaint.

### B. *Administrative Procedure Act Claim*

Plaintiffs also allege EPA's failure to intervene violates the APA. Plaintiffs assert that EPA has "unlawfully withheld or unreasonably delayed" intervention, 5 U.S.C. § 706(1),[2] and that EPA's failure to intervene has been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law", *id.* § 706(2)(A).

EPA contends it is entitled to judgment on the pleadings as to these APA claims because plaintiffs have failed to exhaust administrative remedies and because the APA precludes judicial review of EPA's discretionary deeming duty. Alternatively, EPA contends it is entitled to summary judgment on the APA claims because New York State has recently submitted TMDLs and taken other actions conclusively establishing that EPA need not intervene. EPA's assertions are addressed *seriatim.*

#### 1. *Threshold Legal Claims*

##### a. *Exhaustion*

EPA contends plaintiffs did not exhaust their administrative remedies because they failed to petition EPA to act. EPA is clearly wrong. Exhaustion "is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule [so] requires". *Darby v. Cisneros,* 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) (emphasis in original). In the instant case, there is no legal requirement that plaintiffs petition EPA prior to bringing suit. EPA points to 5 U.S.C. § 555(b); however, that provision merely states that "an interested person *may* appear before an agency . . . for . . . determination of an issue", 5 U.S.C. § 555(b) (emphasis added), and has not been established to constitute an exhaustion requirement. *See Fairchild, Arabatzis & Smith, Inc. v. Sackheim,* 451 F.Supp. 1181, 1185 (S.D.N.Y.1978) ("The absence of detail concerning the procedure to be followed by aggrieved persons (in appearing before the agency) . . . leaves substantial doubt whether § 555(b) constitutes an administrative remedy that must be followed before resort to the courts.").

Absent some specific exhaustion requirement established by Congress or EPA, the Court "may not exercise [its] judicial discretion to impose one". *Bastek v. Federal Crop*

---

**2.** While not material to resolution of EPA's motion, the Court notes that the § 706(1) claim mentioned in plaintiffs' brief is not set forth in the complaint. *See* Third Amended Complaint for Declaratory and Injunctive Relief, dated December 8, 1997, ¶¶ 54–55; *compare id. with id.* ¶¶ 59, 61. Plaintiffs are ordered to request the consent of EPA for leave to amend the complaint formally to add the § 706(1) claim. If such consent is not obtained, the return date for a motion by plaintiffs for leave to amend the complaint, including responsive papers, shall be 30 days from the date of this Opinion and Order.

*Ins. Corp.,* 145 F.3d 90, 94 (2d Cir.1998); *see also Ciba–Geigy Corp. v. Sidamon–Eristoff,* 3 F.3d 40, 45 n. 4 (2d Cir.1993) (APA "prohibits courts from engrafting additional exhaustion requirements."). Therefore, the doctrine of administrative exhaustion does not bar Claims 6 and 7 of plaintiffs' complaint.

### b. *"Committed to Agency Discretion" Exception to Judicial Review*

■ EPA further argues plaintiffs' APA claims are not cognizable because review of EPA's discretionary deeming duty is not available under the APA. EPA is incorrect.

■ The APA sets forth broadranging provisions for judicial review of agency conduct. *See* 5 U.S.C. §§ 701–706. The only exception to such review that could possibly apply in this case is the APA provision precluding review where "agency action is committed to agency discretion by law." *Id.* § 701(a)(2). While that provision might at first glance be read to preclude review of any discretionary agency conduct, the exception is actually much more "narrow", *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), and applies only when "the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment *absolutely*", *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (emphasis added). Thus, the exception has been construed to preclude judicial review only when "no judicially manageable standards are available for judging how and when an agency should exercise its discretion". *Id.; see also Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985) ("The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely nonreviewable under the ... exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised."); *N.A.A.C.P. v. Secretary of Hous. & Urban Dev.,* 817 F.2d 149, 157–58 (1st Cir.1987) (Breyer, J.) (similar); *National Wildlife Fed'n v. Browner,* No. 95–1811, 1996 WL 601451, at *6 (D.D.C. Oct. 11, 1996) (in assessing duties under Clean Water Act, mere "absence of a mandatory duty does not defeat the plaintiffs' attempt to obtain APA review.").

The Court finds that while EPA has some discretion as to when to deem state inaction a "constructive submission", that discretion is not unfettered. The 1972 amendments to the Clean Water Act (then known as the Water Pollution Prevention and Control Act) creating the TMDL provisions were intended swiftly to achieve control over water pollution in this nation. The Act states that the goal of the amendments is to achieve an interim level of water quality by July 1, 1983, and to eliminate all "discharges of pollutants into the navigable waters ... by 1985." 33 U.S.C. §§ 1251(a)(1)-(3).

To attempt to achieve those ambitious objectives, the 1972 amendments set forth specific implementation deadlines. Water quality standards were to be submitted to EPA by mid–1973, with EPA "promptly" to establish such standards itself if a given state's submissions are deemed inadequate. *See* 33 U.S.C. §§ 1313(a)(3) & (b). In addition, a significant (albeit unspecified) number of TMDLs were required to be submitted to EPA and reviewed by mid–1973, again with EPA promptly to establish TMDLs when state submissions are deficient. *See id.* § 1313(d)(2); *see also id.* § 1314(a)(2). States' "continuing planning processes" were due in early 1973 and were to be approved or rejected by EPA within 30 days of submission. *See id.* § 1313(e)(2). Finally, effluent limitations for point sources of pollution were to be established by July 1, 1977. *See id.* § 1311(b).

Similarly, in 1987 Congress added to this comprehensive program provisions addressing pollution released from nonpoint sources. *See id.* § 1329(d). As to such pollution sources, Congress again established a timetable for quick action. *See id.* § 1329(d). And, echoing previous expressions of the appropriate tempo for pollution regulation, Congress stated that nonpoint sources are intended to be controlled "in an expeditious manner". *Id.* § 1251(a)(7).

In the context of the Act's overall scheme and the provisions concerning TMDLs in

particular (including the specific deadlines for initial implementation of some, if not most, TMDLs), it is clear that TMDLs are to be established promptly by the states or, if they are dilatory, by EPA. Promptly, in this context, means within months or, perhaps, within a very few years. Promptly does not mean over the span of decades.

Thus, the Act provides a sufficient framework for determining whether EPA has abused its discretion in failing to intervene. EPA's duty of intervention is not, therefore, "committed to agency discretion by law". 5 U.S.C. § 701(a)(2). Accordingly, Claims 6 and 7 of plaintiffs' complaint state a cause of action under the APA.

### 2. *Summary Judgment*

 In addition to EPA's threshold legal arguments as to plaintiffs' APA claims, EPA asserts it is entitled to summary judgment on those claims because New York State's recent actions eliminate any duty of EPA to intervene. Specifically, EPA notes the State submitted TMDLs to EPA in early 1997 (which submissions are addressed in detail in Part II of this Opinion), submitted additional TMDLs to EPA in early 1998, executed a Memorandum of Agreement establishing a schedule for development of all TMDLs by December 31, 2005, and, even more recently, has established a rolling schedule for completion of all TMDLs by 2008.

Before assessing EPA's argument, it is worth reiterating the standard for summary judgment. A moving party is entitled to summary judgment if the Court determines no genuine issue of material fact exists to be tried and the party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56; *see also Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 128 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden

will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995) (citation omitted); *see also Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1231 (2d Cir.1996).

The Court's function in adjudicating summary judgment motions is not to try issues of fact, but instead to determine whether there are such issues. *See Sutera v. Schering Corp.,* 73 F.3d 13, 15–16 (2d Cir.1995). In determining whether genuine issues of material fact exist, the Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Holt,* 95 F.3d at 129.

The facts proffered by EPA are certainly probative as to whether New York State has taken action sufficient to prevent EPA from being considered in violation of § 706. Assuming EPA's duty to intervene has been triggered, the nature and extent of that duty must be assessed in light of continuing developments, including progress in state efforts to submit TMDLs. It may be the case, for example, that sufficient state progress after a period of delinquency could reduce the extent of EPA intervention required or even render the need for intervention altogether moot.

The facts proffered by EPA do not, however, conclusively eliminate any genuine issue of material fact as to whether EPA must intervene. New York State's recent TMDL submissions cover only a small portion of the relevant waterbodies. In addition, as discussed below, there are genuine issues of material fact as to whether EPA should have approved some of the 1997 TMDL submissions. At the same time, the Memorandum of Agreement and separate rolling schedule for TMDL development apparently are merely aspirational, since they would not appear to be binding on, or enforceable against, the State. Moreover, the deadline for compliance set forth in the Memorandum is still six years away and the rolling schedule may already have affected an extension of that deadline by several years. Thus, drawing all

reasonable inferences in plaintiffs' favor, the Court finds the evidence is insufficient to establish as a matter of law that EPA's duty to intervene has not been triggered or, if triggered, need not be exercised. Accordingly, a genuine issue of material fact exists as to whether EPA has violated the APA by not yet intervening to establish TMDLs for New York State waterbodies. Summary judgment in favor of EPA on Claims 6 and 7 of plaintiffs' complaint would, therefore, be inappropriate.

## II. EPA Treatment of 1997 Reservoir TMDLs

In addition to challenging EPA's alleged failure to intervene and establish TMDLs not already completed by New York State, plaintiffs further allege that EPA has mishandled those TMDLs New York State has submitted. In the Court's previous opinion in this matter, the Court found that genuine issues of material fact exist regarding whether submissions by New York State up until 1995 should properly be considered to be TMDLs. *See NRDC*, 909 F.Supp. at 158. Presently at issue are eighteen phosphorus TMDLs New York State submitted to EPA in 1997 regarding reservoirs supplying drinking water to New York City.

EPA moves for summary judgment that its treatment of the eighteen TMDLs was proper. The TMDLs reviewed by EPA fall into two categories: (i) TMDLs approved by EPA (of which there are eight) and (ii) TMDLs EPA deemed to be "informational" and, therefore, neither approved nor disapproved (comprising the remaining ten). The Court addresses each category of TMDLs separately.

### A. *Approved TMDLs*

Pursuant to the Clean Water Act and the APA, plaintiffs challenge EPA's approval of eight phosphorus TMDLs, asserting that the TMDLs fail to comply in various respects with statutory requirements. As to plaintiffs' Clean Water Act claim, EPA responds that its discretionary determination to approve the TMDLs is not reviewable under the Act. As to plaintiffs' APA claim, EPA asserts its approval of the TMDLs was rea-

sonable and, therefore, that EPA is entitled to summary judgment affirming the approvals.

### 1. *Clean Water Act Claim*

██ EPA argues it is entitled to dismissal of plaintiffs' claim under the Clean Water Act because EPA's decision to approve or disapprove TMDLs is discretionary in nature. *See* 33 U.S.C. § 1365(a)(2). The Court agrees. The Act leaves review of TMDL submissions to the sound judgment of EPA, providing simply that EPA "shall either approve or disapprove such ... load". *Id.* § 1313(d)(2). EPA's determination is necessarily an exercise of discretion involving application of the agency's technical expertise and interpretation of ambiguities and omissions in the Act's TMDL provisions. The substance of that decisionmaking is, therefore, properly characterized as discretionary and, accordingly, is not reviewable under the Clean Water Act. Thus, EPA is entitled to judgment on the pleadings as to Claim 8 of plaintiffs' complaint.

### 2. *APA Claim*

EPA does not contest, however, that its determinations regarding the TMDL submissions are reviewable under the APA. As to plaintiffs' APA claim, EPA instead contends that the TMDLs it approved comply with statutory requirements and that EPA's approval of those submissions therefore could not be found to be in violation of the APA.

██ EPA's handling of the TMDLs constitutes final agency action which may be set aside only if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In assessing EPA's approval of the TMDLs, the Court must conduct a "thorough, probing, in-depth review" of both the legal and factual bases for the agency's decision. *Citizens to Preserve Overton Park, Inc.*, 401 U.S. at 415, 91 S.Ct. 814. The Court must also, however, remain mindful that the scope of review under § 706 "is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Assoc. of the United States, Inc. v. State Farm Mut. Auto. Ins.*

*Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). Deference to EPA's determination is especially warranted to the extent it involves the agency's scientific or other expertise. *See Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *Henley v. Food and Drug Admin.,* 77 F.3d 616, 620 (2d Cir.1996). Thus, generally, agency action will only be found to fail to comply with the APA if

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856.

Plaintiffs contend there are genuine issues of material fact regarding whether several aspects of the TMDLs satisfy statutory requirements and, thus, whether EPA's approval of the TMDLs was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The Court assesses each of plaintiffs' contentions.

### a. Applicable Water Standard

■ Plaintiffs contend there is a genuine issue of material fact as to whether the phosphorus TMDLs implement the applicable water quality standards for the waterbodies addressed.

Resolution of this issue principally involves statutory construction. Section 303(d)(1)(C) of the Act states in relevant part that TMDLs "shall be established at a level necessary to implement the applicable water quality standards". 33 U.S.C. § 1313(d)(1)(C). The applicable water quality standard in New York State for phosphorus is a narrative one providing that phosphorus shall be limited to "[n]one in amounts that will result in algae, weeds and slimes that will impair the waters for their best usages." 6 N.Y.C.R.R. § 703.2. It is uncontested that the "best usage[ ]" for the reservoirs is as a source of drinking water.

EPA concedes the phosphorus TMDLs were not calculated at levels sufficient to allow for safe consumption but, instead, were calculated at a level sufficient only to attain safe recreational use. EPA contends approval of the TMDLs was nonetheless appropriate because New York State has not yet developed criteria for establishing phosphorus TMDLs for safe consumption. Thus, EPA essentially contends it has reasonably interpreted the Act to allow it to approve TMDLs to achieve near-term pollution reduction while criteria are formulated for establishing TMDLs that actually attain the relevant water quality standard.

The Court finds EPA's interpretation inconsistent with the clear terms of the Clean Water Act. The Act's provision stating that TMDLs "shall be established at a level necessary to implement the applicable water quality standards" is unambiguous. 33 U.S.C. § 1313(d)(1)(C). EPA makes no attempt to explain how its position is a plausible interpretation of that language. The language of the Act does not allow for incremental achievement of water quality standards through successive approval of TMDLs that fall short of the required standard.

Thus, because EPA's explanation for approving the TMDLs is "contrary to an intent of Congress expressed in unambiguous terms", *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992), the Court cannot embrace it. Acknowledgment and praise of New York State's progress in phosphorus regulation may well have been an appropriate response by EPA. Approval of the State's submissions *as TMDLs,* however, is contrary to the plain language of the Act and would, therefore, appear not to be "in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, EPA is not entitled to summary judgment as to this issue.

### b. Margin of Safety

■ The Clean Water Act further requires that TMDLs contain a "margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality". 33 U.S.C. § 1313(d)(1)(C). Plaintiffs contend

the 10% margin of safety incorporated into the phosphorus TMDLs approved by EPA does not meet this statutory requirement.

Construing the facts in the light most favorable to plaintiffs, the Court finds a genuine issue of material fact exists as to whether the margin is sufficient. While EPA contends the margin was the product of the best professional judgment of relevant personnel, no specific explanation is provided by EPA as to how exactly the margin was obtained. Moreover, an EPA official has admitted the margin was not based on any mathematical or scientific calculation. *See* Deposition of Rosella O'Connor, dated April 2, 1997, at 366.[3] Finally, while EPA asserts that other conservative assumptions used in calculating the TMDL add a further cushion to the calculation, EPA fails to explain the exact nature and effect of those assumptions.

Given the Court's duty to conduct a "thorough, probing, in-depth review" of agency action to ensure it complies with the APA, *Citizens to Preserve Overton Park,* 401 U.S. at 415, 91 S.Ct. 814, and given the standard of decision on a motion for summary judgment, the Court finds further explanation is required from EPA as to how the margin was calculated and whether it is sufficient. *See Sierra Club,* 772 F.2d at 1051 ("To permit intelligent judicial review an agency must indicate the basis on which it exercised its expert discretion."). Consequently, summary judgment in favor of EPA on this issue would be inappropriate.

### c. *Wasteload Allocations and Load Allocations*

■ EPA regulations require TMDLs to comprise of "[t]he sum of the individual [wasteload allocations] for point sources and [load allocations] for nonpoint sources and natural background." 40 C.F.R. § 130.2(i). Plaintiffs contend there is insufficient evidence that the approved TMDLs contain these components. The Court agrees. The only evidence cited by EPA to establish that appropriate allocations were made is the cover page from New York State's TMDL submissions. That page does not, in fact, indicate whether the calculations occurred. *See* Administrative Record [hereinafter "AR"] at 2833. Other portions of the record suggest that no wasteload allocations and/or load allocations were calculated for at least four of the TMDLs. *Compare id.* at 2851, 2858 *with id.* at 3084. Accordingly, EPA is not entitled to summary judgment as to this aspect of the TMDLs, since approval of TMDLs lacking the required allocations could reasonably be considered not to be "in accordance with law." 5 U.S.C. § 706(2)(A).

### d. *Daily Pollution Limits*

■ The Clean Water Act provides that states shall establish a "total maximum *daily* load". 33 U.S.C. § 1313(d)(1)(C) (emphasis added). Plaintiffs contend the phosphorus TMDLs submitted by New York State should not have been approved because they establish annual, not daily, limits.

EPA argues that its regulations reasonably interpret the Act to authorize setting of annual loads. The regulatory provision cited by EPA does not, however, evince any such interpretation. *See* 40 C.F.R. § 130.2(i) ("TMDLs can be expressed in terms of either mass per time, toxicity, or other appropriate measure.").

EPA further suggests that the annual load may be converted into a daily load limit through use of a coefficient. However, EPA does not explain whether this conversion process achieves the purposes of the Act in requiring a daily load.

Accordingly, the Court is not convinced at this stage of the proceedings that the annual load provided is consistent with the Act's requirements. Further explanation from EPA is necessary. Thus, EPA is not entitled to summary judgment as to this aspect of the TMDLs, since approval of an annual load may not be "in accordance with law." 5 U.S.C. § 706(2)(A).

### e. *Seasonal Variations*

■ The Act requires TMDLs to account for "seasonal variations". 33 U.S.C.

---

**3.** The Court finds consideration of the deposition appropriate given the lack of adequate information in the administrative record as to this issue.

*See Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1052 (2d Cir.1985).

§ 1313(d)(1)(C). Plaintiffs contend a genuine issue of material fact exists as to whether such variations are properly accounted for by the TMDLs. The Court agrees. As already noted, the TMDLs provide only an annual load amount, and EPA has not proffered evidence that this amount properly accounts for seasonal variations. In addition, the representative of the state agency responsible for preparation of the TMDLs has conceded that seasonal variations were not taken into account. *See* Deposition of Albert W. Bromberg, dated April 8, 1997, at 95.[4] Accordingly, EPA is not entitled to summary judgment as to this aspect of the TMDLs, since approval of TMDLs lacking a seasonal variation component may not be "in accordance with law." 5 U.S.C. § 706(2)(A).

### f. *Dissolved Oxygen*

▮ In a one-sentence footnote, plaintiffs raise the additional argument that the TMDLs should not have been approved because they fail adequately to address dissolved oxygen. Plaintiffs provide no explanation of how that omission would render EPA's approval of the phosphorus TMDLs arbitrary and capricious. Instead, plaintiffs merely assert that such an explanation and related proof will be offered at trial. Averring that a basis for an allegation will be forthcoming is insufficient to establish a genuine issue of material fact at the summary judgment stage. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Goenaga*, 51 F.3d at 18. Accordingly, EPA is entitled to summary judgment as to this issue.

In sum, several genuine issues of material fact exist regarding whether EPA violated the APA in approving the eight phosphorus TMDLs. Consequently, summary judgment as to Claim 9 of plaintiffs' complaint would be inappropriate.

4. The Court finds consideration of the deposition appropriate given the lack of adequate information in the administrative record as to this issue. *See Sierra Club*, 772 F.2d at 1052.

5. The Court presumes EPA's treatment of the ten TMDLs as "informational" constitutes final agen-

### B. *"Informational" TMDLs*

▮ EPA contends it is entitled to summary judgment as to its treatment of the remaining ten 1997 reservoir TMDLs, which EPA deemed to be "informational" and, therefore, neither approved nor disapproved. EPA argues that because the TMDLs ultimately showed the relevant segments of waterbodies are not water-quality limited, EPA had discretion neither to approve nor disapprove them.[5]

The Court finds that there is a genuine issue of material fact as to whether the interpretation of the Clean Water Act underlying EPA's decision is contrary to congressional intent. It is undisputed that the waterbodies for which New York State submitted the ten TMDLs were and are listed by the State as water-quality limited. As to such TMDLs, the Clean Water Act does not appear to provide EPA with discretion whether to approve or disapprove them. The Act states that "[e]ach State shall establish ... the total maximum daily load" for each waterbody set forth on the state's list; that "[e]ach State shall submit" those TMDLs to EPA; and that EPA "shall either approve or disapprove" such TMDLs. 33 U.S.C. §§ 1313(d)(1) & (2). The Act further provides that TMDLs may be treated as "informational" only if the relevant waterbody is not listed on a state's priority list. *See* 33 U.S.C. § 1313(d)(3).

It may be too wooden a reading of the Act to require EPA to approve or disapprove TMDLs for waterbodies that are not, in fact, water-quality limited, and which should not, therefore, be on states' priority lists. Yet, the Court is not certain at this stage of the proceedings whether the convenience of allowing EPA to deem such TMDL submissions "informational" after the fact might not defeat some important purpose or purposes of the Act. Further development of arguments pertaining to this issue is required.

cy action, since it would appear to "mark the 'consummation' of the agency's decisionmaking process" as to the TMDLs and also has "legal consequences". *Bennett v. Spear*, 520 U.S. 154, ——, 117 S.Ct. 1154, 1168, 137 L.Ed.2d 281 (1997).

Accordingly, EPA is not entitled to summary judgment as to Claims 10 and 11 of plaintiffs' complaint, since its treatment of the ten TMDLs may not be "in accordance with law." 5 U.S.C. § 706(2)(A).

### III. Duty to "Oversee and Effectuate" TMDL Program

Finally, EPA asserts it is entitled to judgment on plaintiffs' claims under the Clean Water Act and the APA that EPA has failed properly to "oversee and effectuate" implementation of § 303(d) of the Clean Water Act.

■ With respect to plaintiffs' Clean Water Act claim, it is likely that discretionary duties of EPA could not form the basis for a cause of action under the Act for failure to "oversee and effectuate" the TMDL program. However, the Court finds EPA's sparse analysis fails to establish that the specific duties underlying plaintiffs' claim (other than those already addressed in this Opinion) are, in fact, discretionary. Accordingly, EPA is not entitled to judgment on the pleadings as to Count 12 of plaintiffs' complaint.

■ As to plaintiffs' APA claim, EPA also fails sufficiently to explain why the claim fails to state a viable cause of action. EPA's assertion that the claim is merely duplicative of plaintiffs' other claims is clearly incorrect. Even if it were correct, EPA does not explain why that fact would be dispositive. Therefore, the Court finds EPA is not entitled to judgment as to Count 13 of plaintiffs' complaint.[6]

### IV. Guidelines for Further Proceedings in This Action

With respect to future assessment of the claims alleged by plaintiffs, the Court wishes to make two comments. First, regarding

Claims 6 and 7, the parties should give further attention to defining the precise contours of the standard for assessing a claim of agency inaction or delay. The Court directs the parties to review the decisions of the United States Court of Appeals for the District of Columbia Circuit in *Cutler v. Hayes,* 818 F.2d 879 (D.C.Cir.1987), *Telecommunications Research & Action Center v. Federal Communications Commission,* 750 F.2d 70 (D.C.Cir.1984), and *Sierra Club v. Gorsuch,* 715 F.2d 653 (D.C.Cir.1983), as well as any other authorities relevant to this issue.

Second, while plaintiffs have repeatedly asserted they are entitled to "trial" of their claims, the Court is not presently convinced that trial is the appropriate mechanism for reviewing EPA's conduct.

■ "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973) (per curiam); *see Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985). Typically, review of the administrative record upon which the agency premised its decisions is sufficient for courts to determine whether the agency has complied with its responsibilities.

■ It is occasionally the case, however, that the administrative record is nonexistent or incomplete in some important respect; that the explanations set forth in the record are inadequate to justify the action taken; or that the record contains material inconsistencies. In such circumstances, where the "[c]ourt[ ] cannot intelligently perform [its] reviewing function" based solely on the administrative record, a more liberal "plenary" review is appropriate. *Sierra Club v. United States Army Corps of Eng'rs,* 772 F.2d 1043, 1052 (2d Cir.1985). Plenary review involves,

---

6. EPA also contends that this claim and others added in plaintiffs' most recent amendment to their complaint must be dismissed because EPA was not notified of the claims in a 60–day notice pursuant to 33 U.S.C. § 1365(b)(2). EPA's assertion clearly lacks merit. The 60–day notice requirement applies only to "commence[ment]" of an action, not to addition of claims to a complaint. *See* 33 U.S.C. § 1365(b)(2); *see also Pub-*

*lic Interest Research Group v. Hercules, Inc.,* 50 F.3d 1239, 1248 (3d Cir.1995). EPA does not contest that it was properly notified of plaintiff's original complaint. Moreover, assuming § 1365(b)(2) does apply, EPA's consent to the addition of the new claims might well constitute constructive notice sufficient to satisfy the notice requirement.

in essence, a "remand to the agency for additional investigation or explanation" so that the existing administrative record can be supplemented with documentation, affidavits or testimony from the agency sufficient for the court to complete its assessment. *Florida Power,* 470 U.S. at 744, 105 S.Ct. 1598; *see Sierra Club,* 772 F.2d at 1052.

By contrast, *de novo* review, in which the court starts afresh, compiling its own record and considering, when appropriate, evidence deriving from sources other than the agency, is strictly limited to situations that would appear to be irrelevant to plaintiffs' claims. *See Camp,* 411 U.S. at 141–42, 93 S.Ct. 1241.

In view of these principles of review of agency conduct, a full trial may be inappropriate in the instant case. Plaintiffs' challenge to New York State's TMDL submissions may well be the sort that can be decided based on final briefing by the parties incorporating references to relevant portions of the existing administrative record and, where appropriate, to supplementary affidavits or deposition excerpts from agency officials. In that scenario, live testimony, if necessary at all, might be limited solely to cross-examination of relevant agency officials. At the same time, consideration of documents, affidavits or testimony from sources other than the agency (or agencies) would likely be inappropriate.

With regard to plaintiffs' claim of agency delay or inaction and other remaining claims, it may be the case that a broader factual inquiry is required. However, the relevant facts might nonetheless appropriately be limited to the sources mentioned above.

The Court requests that the parties discuss these issues during the next two weeks. The parties should notify the Court by letter of the outcome of those discussions and of the parties' respective positions within 30 days of the date of this Opinion and Order.

## CONCLUSION

For the reasons stated above, defendants' motion for judgment on the pleadings or, in the alternative, for summary judgment is hereby GRANTED as to Claims 3, 4 and 8 of plaintiffs' complaint and hereby DENIED as to Claims 6, 7, 9, 10, 11, 12 and 13. The parties shall appear for a pre-trial conference before this Court at the United States Courthouse, 500 Pearl Street, New York, New York, on December 18, 1998, at 9:30 a.m. **SO ORDERED.**