NATURAL RESOURCES DEFENSE COUNCIL, INC.; Environmental Defense Fund, Inc.; Alan G. Hevesi, Plaintiffs,

v.

Jeanne FOX, Regional Administrator, United States Environmental Protection Agency, Region II; Carol Browner, Administrator, United States Environmental Protection Agency; United States Environmental Protection Agency, Defendants.

No. 94 Civ. 8424 (PKL).

United States District Court,
S.D. New York.

Dec. 11, 1995.

---

Mark A. Izeman and Eric A. Goldstein, Natural Resources Defense Council, Inc., New York City, for Plaintiffs Natural Resources Defense Council, Inc. and Environmental Defense Fund, Inc.

Alan G. Hevesi, Plaintiff, New York City, pro se.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, for Defendants (William J. Hoffman, of counsel).

## OPINION AND ORDER

LEISURE, District Judge:

This is an action (i) under the Clean Water Act based on the alleged failure of the Administrator of the Environmental Protection Agency (the "EPA") to perform a non-discretionary duty, and (ii) under the Administrative Procedure Act based on allegedly arbitrary and capricious action by the EPA. Both sides have moved for partial summary judgment on the issue of liability. Ultimately, plaintiffs want the EPA to promulgate water-quality based pollution limits for New York State's waters, and to disapprove of New York's policy for preventing the degradation of New York's clean waters. For the reasons stated below, the Court denies the parties' motions for summary judgment regarding the EPA's duty to promulgate pollution limits on the ground that there are triable issues of fact, and grants defendants' motion for summary judgment regarding New York's antidegradation policy on the grounds that the action to review the EPA's action under the Administrative Procedure Act is barred by the statute of limitations. The Opinion considers the causes of action separately.

## I. *The EPA's Duty to Establish Total Maximum Daily Loads for New York's Waters*

The Clean Water Act provides for citizen suits against the Administrator of the Environmental Protection Agency "where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." 33 U.S.C. § 1365(a)(2). Plaintiffs argue that New York had a duty to promulgate pollution limits, called Total Maximum Daily Loads ("TMDLs"), for various polluted waters and submit them to the EPA for review; that New York failed to fulfill its duty; and that the EPA thus had a duty to establish TMDLs for New York. The Court will first summarize the statutory scheme, then consider whether a constructive submission has occurred, concluding that triable issues of fact exist, and finally will consider whether the action regarding TMDLs is time-barred.

### A. *Summary of the Statutory Scheme*

The Clean Water Act places "primary reliance for developing water quality standards on the states." *Scott v. City of Hammond*, 741 F.2d 992, 994 (7th Cir.1984). Water pollution is controlled according to two approaches: the effluent-limitation approach and the water-quality-based approach. The effluent limitation approach focuses on regulating, through the issuance of permits and required technology-based abatement methods, the amount of pollutants discharged by a pollution source. The water-quality-based approach focuses on establishing a quality standard for a body of water, and then regulating the various sources of pollution as needed to meet that standard.

In order to facilitate the reduction of water pollution, states are directed to develop water quality standards, which include both a pollution standard and a designation of the uses of a waterway. *See* 33 U.S.C. § 1313(a). "Timely adoption by states of water quality standards is enforced by withholding of grant funds." *Scott*, 741 F.2d at 995 n. 7 (citing 33 U.S.C. § 1313a). It may be that the effluent-limitation approach will meet the water quality standard, in that technology-based reduction of the discharge of pollutants into the

particular body of water will ensure that the level of pollution in the water will be lower than the established standard. However, if the reduction in effluence is not enough to reach the established water quality standard, the water-quality-based approach must be used. States are required to identify those waters which, taking into account technology-based reduction of pollutant discharge, will fail to meet the water quality standard established for those waters. *See* 33 U.S.C. § 1313(d)(1)(A)–(B). The states must then prioritize those waters that are identified as failing to meet the standards, and develop water-quality-based controls in order to meet the standard. A water-quality-based control is designed to determine the maximum amount of particular pollutants the water can absorb and still meet the standard, and then to apportion that maximum amount among the various sources of pollution in order to control the pollution.

The water-quality-based approach established by Congress forces the states to study their water bodies, set quality standards, prioritize their water-quality improvement needs, and establish Total Maximum Daily Loads ("TMDLs") for pollutants. The benefit of this approach is that it facilitates the state's ability to meet its water-quality standards by controlling those sources of pollution that are easiest to control. The congressional scheme is not met merely by establishing effluence limits for specific sources, because Congress mandated a comprehensive approach to each body of water's quality standard. Without an understanding of the Total Maximum Daily Load, and the various sources which lower a body of water's quality, there is little chance that the pollution is most efficiently controlled. With the water-quality-based approach, the burden of pollution control can be minimized while maximizing the benefit to the overall quality of the body of water.

The EPA oversees this congressional scheme, and is required to perform a state's duties if the state fails to do so or if the state's attempts to perform its duties are inadequate. "The EPA reviews a water quality standard promulgated by a State to ensure that it 'protect[s] the public health or

welfare, enhance[s] the quality of water and serve[s] the purposes of [the] Act.'" *Scott,* 741 F.2d at 994–95 (quoting 33 U.S.C. § 1313(c)(2)) (alteration in original). The EPA likewise reviews the state's lists of water-quality limited segments, the state's priority ranking of segments, and the state's Total Maximum Daily Load determinations. The lists and loads are to be submitted to the Administrator "from time to time", with the first submission of water-quality limited segments list and Total Maximum Daily Loads for pollutants due on June 26, 1979. *See* 33 U.S.C. § 1313(d)(2) ("the first such submission not later than one hundred and eighty days after the date of publication of the first identification of pollutants under section 304(a)(2)(D) [33 U.S.C. § 1314(a)(2)(D) ]"); 43 Fed.Reg. 60662 (Dec. 28, 1978) (identifying pollutants under section 304(a)(2)(D)); *see also Scott,* 741 F.2d at 996 n. 10 (deadline of June 26, 1979); *Alaska Ctr. for the Env't ("ACE") v. Reilly,* 762 F.Supp. 1422, 1424 (W.D.Wash.1991) (same). *But see Environmental Defense Fund, Inc. v. Costle,* 657 F.2d 275, 295 (D.C.Cir.1981) (states' duty to submit TMDL calculations arose June 28, 1979). Within thirty days of submission, "[t]he Administrator shall either approve or disapprove such identification and load." 33 U.S.C. § 1313(d)(2). If the Administrator disapproves, "he shall not later than thirty days after the date of such disapproval identify such waters in such state and establish such loads for such waters as he determines necessary to implement the water quality standards applicable to such waters." *Id.* In sum, states were to identify water-quality-limited segments, prioritize them, and establish TMDLs by June 26, 1979. If submitted timely, EPA would have been directed to approve or disapprove submissions by July 26, 1979, and establish lists and TMDLs for disapproved submissions by August 25, 1979.

**B.** *Constructive Submission of no TMDLs*

Courts have held that a failure by a state to submit TMDLs to the EPA for review amounts to a "constructive submission" of no TMDLs, and the EPA has a non-discretionary duty to approve or disapprove this constructive submission, and upon disapproval, establish TMDLs for the state. *See Scott,*

741 F.2d at 996–98; *Sierra Club v. Browner,* 843 F.Supp. 1304, 1312 (D.Minn.1993); *ACE,* 762 F.Supp. at 1429; *cf. Environmental Defense Fund,* 657 F.2d at 295 (denying summary judgment motion filed before deadline of June 26, 1979 as premature, but admonishing the "EPA to approve or disapprove such identification, prioritization, and load limits within the requisite statutory framework and time limits").

**1.** *The Standard for Determining Whether a Constructive Submission Has Occurred*

■ Defendants argue that a finding of constructive submission, and a resultant triggering of the EPA's duty, requires a subjective decision on the part of the state not to submit TMDLs. Although the Court recognizes that phrases in the various cases support this interpretation, the Court is persuaded that the statutory scheme intends prompt establishment of TMDLs, which intention would be thwarted by a subjective test of constructive submission.

The relevant section of the statute provides, in mandatory language, that the first state submission to the EPA of listing and prioritization of water-quality-limited segments, along with TMDLs for those segments, is due 180 days after the EPA publishes a list of pollutants susceptible to control by TMDLs. *See* 33 U.S.C. § 1313(d)(2). Following that, the statute provides 30 days for the EPA to approve or disapprove of state submissions. *Id.* Upon disapproval, the statute provides 30 days for the EPA to promulgate these lists and TMDLs. This enactment by Congress of specific deadlines, to the day, demonstrates a congressional intent that TMDLs be established promptly. Although these tight deadlines might mean that initially established TMDLs would be based on less than ideal data, that fact was considered and addressed by Congress, as demonstrated by the statutory direction to use "a margin of safety which takes into account any lack of knowledge." *Id.* § 1313(d)(1)(C). As expressed by one EPA employee, "In other words, Congress says ignorance is no excuse for inaction. Just

add a margin of safety to compensate for the lack of knowledge and keep moving." *ACE*, 762 F.Supp. at 1429 (quoting Thomas Wilson, Chief of the Office of Water Planning, EPA Region X, EPA Nonpoint Source News–Notes, October 1990, at 20).

The Circuit Court case law on the subject, although equivocal, also at points expresses the view that inadequate compliance with the statutory scheme, including its deadlines, perhaps should amount to a constructive submission triggering the EPA's duty. For example, in *Scott*, the Seventh Circuit wrote, "We cannot allow the states' refusal to act to defeat the intent of Congress that TMDL's be established promptly—in accordance with the timetable provided in the statute." *Scott*, 741 F.2d at 998. As noted above, *see* supra Part I.A., the timetable provided in the statute, taking into account the EPA's initial delay in publishing an identification of pollutants, contemplates that initial TMDLs for water-quality-limited segments would be completed by August 25, 1979. Similarly, in *Environmental Defense Fund*, the D.C. Circuit admonished the EPA to carry out its duties within the statutory framework and stated, "we urge EPA to carefully heed the statutory deadlines in the future." *Environmental Defense Fund*, 657 F.2d at 295.

Based on the specific deadlines set forth in the statute, and the importance of TMDLs as a foundation for creating cohesive water-quality-based limitations, the Court holds that to require a subjective intent on the part of a state would undermine the intent of Congress. Mere objective failure to submit TMDLs for water-quality-limited segments is enough to trigger the non-discretionary duties of the EPA.

2. *Application of the Standard*

■ Plaintiffs argue that "New York's failure for more than 15 years to formally sub-mit to [the EPA] TMDLs developed pursuant to § 303(d) of the Act constitutes a 'constructive submission' of no TMDLs." Plaintiffs' Memorandum of Law at 13. However, defendants have provided evidence, which the Court must take as true in considering plaintiffs' summary judgment motion, that in fact New York has created and submitted TMDLs to the EPA, and the EPA has approved them. *See, e.g.*, Declaration of Philip Sweeney ¶ 7 ("we also review the TMDLs/WLAs underlying the permits we examine"); Declaration of Rosa T. O'Connor ("O'Connor Decl.") ¶ 17 ("EPA reviewed New York's program by ... reviewing individual TMDLs/WLAs from time to time"); *id.* ¶ 18 ("EPA determined that the TMDLs/WLAs were acceptable"). In addition, it is reasonable to draw an inference from the documentary evidence submitted, which describes processes used by New York in creating various pollution controls, that TMDLs were in fact created. *See, e.g.*, O'Connor Decl.Ex. A ("Maximum allowable loads and oxygen demanding wasteload allocations are developed utilizing mathematical models ..." and certain assumptions). Although the Court, like plaintiffs, is left wondering "where are the TMDLs?",[1] the Court must deny plaintiffs' summary judgment motion on the grounds that the evidence submitted by the EPA has created a triable issue of fact of whether New York has created and submitted TMDLs.

Defendants' motion for summary judgment likewise must be denied. The assertions of plaintiffs have created a triable issue of fact regarding which TMDLs specifically have been created, and whether they are adequate under 33 U.S.C. § 1313(d)(2) to prevent the triggering of the EPA's duties by a constructive submission.

---

1. As explained by plaintiffs, TMDLs are generally expressed as a total tons per day limit. *See* Plaintiffs' Reply Memorandum of Law at 10. The "Preliminary Draft" of a Wasteload Allocation Analysis for the Oswego River basin, *see* O'Connor Decl.Ex. H, appears to be the only document submitted which includes actual volume per day limits.

The Court notes that it is unclear from this document analyzing the Oswego River basin whether the listed total loading per pollutant or the listed "allowable Aquatic limit" corresponds to the water-quality determined Total Maximum Daily Load. If the allowable Aquatic limit is the maximum loading permissible in order to meet the water quality standard for the Oswego River basin, the combined allocations to the various point sources is roughly double the maximum load for most pollutants. This state of affairs is exactly the type of problem that water-quality-based limits are designed to prevent by setting the maximum allowable load and from that deriving the individual allocation for each point source.

C. *The Timeliness of Plaintiffs' Section 1365(a)(2) Claim*

1. *Statute of Limitations*

■ Defendants argue that plaintiffs' § 1365 claim is time-barred, asserting that it is subject to the six-year statute of limitations of 28 U.S.C. § 2401(a). *See* Defendants' Consolidated Memorandum of Law at 33–34. The statute providing for citizen enforcement of the Administrator's non-discretionary duties under the Clean Water Act references no statute of limitations, and which statute of limitations, if any, applies appears to this Court to be an issue of first impression.[2]

The applicable statute of limitations, if any, must be considered in the context of the statutory scheme for enforcement of the Administrator's non-discretionary duties. The statute sets forth mandatory duties of the Administrator; no other body is required by the statute to review submissions of a state or to establish Total Maximum Daily Loads in the event a state submission is disapproved. Therefore, where the Administrator has a duty to review submissions or establish TMDLs beginning on a particular day, with a deadline 30 days later, if the deadline passes without action, the recourse for enforcing the mandatory duty established by the Congress is the citizen suit under section 1365(a)(2). If that mode of enforcement were to be foreclosed by a statute of limitations, the result will be far more than the unfortunate, but necessary foreclosure of rights caused by most statutes of limitations. Most statutes of limitations foreclose the enforcement of rights of general application. When one potential plaintiff loses the right to sue, the rule of law still remains in force. By contrast,

where there is only one body charged with a duty by Congress, and that body cannot be forced by the Court to carry out its duty because of a statute of limitations, the practical result is a repeal of the mandatory duty itself. The statute was enacted in order to create a perpetual scheme for protecting the nation's water quality, and does not evince an intent for the mandatory duties of the Administrator to expire after a period of nonfeasance. The Act, like other acts of Congress, can be amended or repealed by subsequent action by Congress and the President. The practical effect of imposing a statute of limitations in a suit such as this is to repeal the mandatory duties established by Congress and the President without the constitutionally prescribed scheme for altering a statute of the United States.

The Administrator has a clear, non-discretionary duty to review and supplement state actions under the Clean Water Act, and it would be perverse to excuse that duty after sustained nonfeasance. To illustrate the drastic result of defendants' proffered statute of limitations: assuming the Administrator's non-discretionary duty to establish TMDLs were triggered on August 25, 1979, the six-year statute of limitations cited by defendants would work a repeal of the mandatory duties of the Administrator on August 25, 1985. Such a result is counter to the intent of Congress in enacting the Clean Water Act. Therefore the Court holds that a citizen suit to enforce a failure by the administrator to perform a non-discretionary duty under 33 U.S.C. § 1365(a)(2) is not subject to any statute of limitations.

■ In the alternative, the Court holds that the failure of the Administrator is re-

**2.** Some courts have held that citizen suits in the nature of private attorney general actions are subject to the five year statute of limitations of 28 U.S.C. § 2462 for actions to enforce a civil penalty. *See, e.g., Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 608 F.Supp. 440, 448 (D.Md.1985). Others have held that there is no statute of limitations for citizen suits to enforce a permit violation under the Clean Water Act. *See Student Pub. Interest Research Group, Inc. v. P.D. Oil & Chemical*, 627 F.Supp. 1074, 1083–85 (D.N.J. 1986) (rejecting application of statute of limitations of 28 U.S.C. § 2415). *See generally* Carie Goodman McKinney, Note, *Statute of Limitations*

*for Citizen Suits Under the Clean Water Act*, 72 Cornell L.Rev. 195 (1986). The only case cited by defendants as applying the six-year statute of limitations of section 2401, although involving a complaint stating claims under both the Administrative Procedure Act and the Clean Water Act, was a decision based largely on the Administrative Procedure Act. *See Natural Resources Defense Council v. USEPA*, 806 F.Supp. 1263, 1277 (E.D.Va.1992), *aff'd*, 16 F.3d 1395 (4th Cir.1993). Therefore, the assertion that it held that the section 2401 statute of limitations applies to suits under the citizen suit provision of the Clean Water Act is dubious.

peated, and therefore a new cause of action accrues, whenever the Administrator's duties are triggered by either a non-submission or an inadequate submission by a state "from time to time," 33 U.S.C. § 1313(d)(2). In other words, the continued failure of a state to establish TMDLs creates a continuing duty of the Administrator to disapprove of the state's actions and to promulgate TMDLs. Because the state is directed to create TMDLs and submit them to the EPA from time to time, the continued failure to do so is also a repeated failure to do so, triggering separate duties of the Administrator to respond. Therefore, a suit may be brought to enforce the Administrator's non-discretionary duty even where, as here, the first triggering of the Administrator's duty arguably occurred in 1979. The continued failure by the state to submit TMDLs to the EPA triggered subsequent duties of the Administrator to respond, with subsequently accruing causes of action under the citizen suit provision of 33 U.S.C. § 1365(a)(2). Therefore, the Court finds that at some point within the last six years, the Administrator had a duty to review the states' submissions which were due, pursuant to statute, from time to time. A cause of action under 33 U.S.C. § 1365(a)(2) accrued at that point within the last six years. Therefore, the instant suit to enforce the failure of the Administrator to perform the non-discretionary duty is not time-barred by the six-year statute of limitations of 28 U.S.C. § 2401. The Court need not determine precisely when during the last six years the cause of action accrued, because the Court finds that regardless the statute has not run.

### 2. *Laches*

▮ The action to compel the Administrator to perform a non-discretionary duty is equitable in nature, because it seeks an order from the court to do something, rather than a compensatory award or civil penalty. Defendants have asserted in their answer, though have not argued the point on the instant motion, that the action is barred by the equitable defense of laches.

▮ However, laches is no defense in a suit to enforce a public right or protect the public interest. *Cf. United States v. Summerlin,* 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283 (1940) (United States not barred by laches). Because a citizen suit to enforce a non-discretionary duty of the Administrator is a suit to protect the public interest, laches does not apply. *See Student Pub. Interest Research Group, Inc. v. P.D. Oil & Chemical,* 627 F.Supp. 1074, 1085 (D.N.J.1986).

▮ Even if laches applied in general, it would not bar plaintiffs' suit here. An equitable action is barred by laches where the defendant establishes "both plaintiff's unreasonable lack of diligence under the circumstances in initiating an action, as well as prejudice from such delay." *King v. Innovation Books,* 976 F.2d 824, 832 (2d Cir.1992). Prejudice can either be in the form of a diminished ability to defend against the suit or increased hardship in ordering the requested relief. Defendants have stated no prejudice to their defense of this case. In addition, it is clear that there can be no prejudice to defendants from any delay in bringing the suit, because their duty to review state actions pursuant to the Clean Water Act, and to establish TMDLs where states fail to do so, is no different today than it was initially. The burden of fulfilling this duty also is no greater today than it was initially. Therefore, because there is no prejudice to defendants from the delay in bringing this citizen suit, the action is not barred by the equitable defense of laches.

In sum, with respect to the parties' motions on claims three and four regarding the Administrator's non-discretionary duty to review TMDLs, or to establish TMDLs, the Court finds that there are triable issues of fact requiring that the motion of each party be denied. In addition, the Court finds that the action is timely.

### II. *Antidegradation*

Plaintiffs challenge as arbitrary and capricious the EPA's approval of New York State's 1992 revisions of its water quality standards pursuant to the Administrative Procedure Act, *see* 5 U.S.C. § 706(2). Plaintiffs' argument is that the 1992 revisions did not include an adequate antidegradation poli-

cy, as required by 40 C.F.R. § 130.6, and therefore should not have been approved. Defendants counter that only new or revised water quality standards are subject to review by the EPA under the Clean Water Act, *see* 33 U.S.C. § 1313(c)(2), and therefore the review of the 1992 revisions of New York's water quality standards did not include, and need not have included, a review of New York's antidegradation policy. In fact, New York's antidegradation policy was submitted for review and approved in 1985.

 The initial question, then, is whether the EPA reviewed the state's antidegradation policy in 1992. The statutory language clearly only requires review of new or revised standards by the EPA. *See* 33 U.S.C. § 1313(c)(2). Even if the statutory language were ambiguous, the Court would find that the EPA's interpretation of it to require only review of new or revised water quality standards to be reasonable, and therefore entitled to deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). Furthermore, an agency's interpretation of its own regulations is entitled to greater deference. *See Leslie Salt Co. v. United States*, 896 F.2d 354, 357 (9th Cir.1990), *cert. denied*, 498 U.S. 1126, 111 S.Ct. 1089, 112 L.Ed.2d 1194 (1991); *cf. United States v. Yuzary*, 55 F.3d 47, 51 (2d Cir.1995) ("Federal courts are bound by an agency's interpretation of its own legislative rule unless the interpretation is inconsistent with the legislative rule, violates the constitution or a federal statute, or is plainly erroneous."). The EPA's interpretation of its regulations requiring a review of officially adopted revisions of water quality standards, *see* 40 C.F.R. § 131.21, to only encompass a review of the revised parts of the state's system of water quality standards is eminently reasonable and entitled to deference by this Court. Therefore, the EPA's interpretation that there has been no review of New York's antidegradation policy since 1985 is adopted by this Court.

 Next the Court must determine whether the approval of the 1992 revision was arbitrary and capricious because it did not contain an antidegradation policy. The EPA interprets 40 C.F.R. § 131.6, which states that an antidegradation policy "must be included in each State's water quality standards submitted to EPA for review," to require only initial water quality standards to meet this requirement, and once an antidegradation policy has been approved, submitted revisions to the water quality standards need not each contain an antidegradation policy. Again the Court finds this interpretation of the relevant regulations, *see* 40 C.F.R. § 131.1, 131.5–.6, to be reasonable and entitled to deference. Therefore, the Court finds that the approval of the 1992 revisions, despite their omission of any antidegradation policy, was not arbitrary and capricious and shall not be set aside.

 Finally, the Court finds that a review of the EPA's 1985 approval of New York's antidegradation policy is barred by the statute of limitations. The Second Circuit has held that the six-year statute of limitations of 28 U.S.C. § 2401 applies to Administrative Procedure Act claims. *See Blassingame v. Secretary of the Navy*, 811 F.2d 65, 70 (2d Cir.1987). Although there may be some Administrative Procedure Act claims that would fall outside this rule, *see Wind River Mining Corp. v. United States*, 946 F.2d 710, 715 (9th Cir.1991) (agency decision exceeding constitutional or statutory authority not subject to six-year limitation), this is not one of them, *see id.* ("[I]f the person wishes to bring a policy-based facial challenge to the government's decision, that . . . must be brought within six years."). Therefore, the Court grants defendants' summary judgment motion with respect to count five, the challenge to EPA's approval of the 1992 submission based on the asserted inadequacy of New York's antidegradation policy.

## CONCLUSION

For the reasons stated above, the Court HEREBY DENIES plaintiffs' motion and defendants' motion for summary judgment on claims three and four of the complaint. The Court HEREBY GRANTS defendants' motion for summary judgment on claim five of the complaint. Without objection from either side, the Court also HEREBY DIS-

MISSES claims one and two of the complaint as moot.

**SO ORDERED.**