NATURAL RESOURCES DEFENSE COUNCIL, INC., Environmental Defense Fund, Inc., and Alan G. Hevesi, Plaintiffs,

v.

Jeanne FOX, Regional Administrator, United States Environmental Protection Agency, Region II, Carol Browner, Administrator, United States Environmental Protection Agency, and United States Environmental Protection Agency, Defendants.

No. 94 CIV. 8424 (PKL).

United States District Court, S.D. New York.

Feb. 6, 2001.

Natural Resources Defense Council, Inc., New York, Mark A. Izeman, of counsel, Eric A. Goldstein, of counsel, for Plaintiffs.

Mary Jo White, United States Attorney, Southern District of New York, New York,

Andrew W. Schilling, of counsel, for Defendants.

## OPINION AND ORDER

LEISURE, District Judge.

### BACKGROUND

Plaintiffs, Natural Resources Defense Council, Inc., Environmental Defense Fund, Inc., and Alan G. Hevesi (collectively "NRDC") brought the underlying action against the Environmental Protection Agency and two of its administrators (collectively "EPA") pursuant to the Clean Water Act ("CWA") and the Administrative Procedure Act ("APA"). NRDC brought the underlying action to enforce in New York a provision of the CWA that requires that threatened water bodies in each state be identified and that pollution limits be set for each state's water bodies.

This action was litigated in two major phases. In the first phase of the litigation, plaintiffs alleged that in the face of New York State's failure to identify threatened water bodies and to establish pollution limits, known as total maximum daily loads ("TMDLs"), for its water bodies, the EPA unlawfully failed to intervene and identify the threatened water bodies and to establish the pollution limits for New York. Plaintiffs commenced the action in November of 1994, alleging five claims against the EPA. In Claims One through Four, plaintiffs alleged that the EPA violated the CWA when it did not treat New York's failure to submit a list of threatened water bodies and TMDLs as a "constructive submission," disapprove that constructive submission, and then identify the threatened water bodies and set the TMDLs. *See* Complaint. In Claim Five, plaintiffs alleged that the EPA's approval of New York State's 1992 revisions of its water quality standards was arbitrary and capricious in violation of the APA. *See id.* In March of 1997, plaintiffs amended their complaint to add Claims Six and Seven, in which plaintiffs alleged that the EPA violated the APA because it did not formally

disapprove New York State's constructive TMDL submission and promulgate TMDLs for New York in response to New York State's inaction. *See* Second Amended Complaint. In sum, in the first phase of the litigation, which consisted of Claims One through Seven, plaintiffs alleged that the EPA violated the CWA and the APA by failing to act in the face of New York State's inaction.

The second phase of this litigation began in 1997 when New York State submitted TMDLs for eighteen reservoirs and the EPA acted on the TMDLs. The EPA approved eight of the TMDLs and treated ten of the TMDLs as "informational." In December of 1997, plaintiffs amended their complaint two more times to add Claims Eight through Thirteen. In Claims Eight and Nine, plaintiffs challenged under the CWA and the EPA, respectively, the EPA's approval of eight of the TMDLs. In Claims Ten and Eleven, plaintiffs challenged under the CWA and the APA, respectively, the EPA's treatment of the remaining ten TMDLs as "informational." *See* Third Amended Complaint. In Claims Twelve and Thirteen, plaintiffs claimed that the EPA violated the CWA and the APA, respectively, by failing to "oversee and effectuate" New York's TMDL program. *See id.*

In its 1995 Opinion and Order, the Court dismissed Claims One and Two as moot because New York had submitted a list of threatened water bodies to the EPA, and the Court granted the defendants' summary judgment motion with respect to Claim Five. *See Natural Resources Defense Council, Inc. v. Fox,* 909 F.Supp. 153 (S.D.N.Y.1995) [hereinafter, "NRDC I"]. In its 1998 Opinion and Order, the Court granted defendants' summary judgment motion with respect to Claims Three, Four, and Eight. *See Natural Resources Defense Council, Inc. v. Fox,* 30 F.Supp.2d 369 (S.D.N.Y.1998) [hereinafter, "NRDC II"]. In its 2000 Opinion and Order, the Court entered judgment in favor of plain-

tiffs on Claim Ten but dismissed all other claims. *See Natural Resources Defense Council, Inc. v. Fox*, 93 F.Supp.2d 531 (S.D.N.Y.2000) [hereinafter, "NRDC III"].

Plaintiffs now bring this Motion seeking attorneys' fees and costs.

## DISCUSSION

### I. *Prevailing Party*

The Clean Water Act authorizes the Court to "award costs of litigation (including reasonable attorney and expert fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d). The determination of "whether a plaintiff is a 'prevailing party' within the meaning of the fee-shifting statutes is a threshold question that is separate from the question of the degree to which the plaintiff prevailed." *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir.1998).[1]

"[A] plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992). "For a plaintiff to be considered a 'prevailing party,' and thus eligible for an award of fees, he need not have succeeded on 'the central issue' in the case ... and need not have 'obtained the primary relief sought.'" *LeBlanc–Sternberg*, 143 F.3d at 757 (citing *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 790–91, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989) and *Carroll v. Blinken*, 42 F.3d 122, 130 (2d Cir.1994)). Rather, "plaintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit. This is a generous formulation that brings the plaintiff only across the statutory threshold. It remains for the district court to determine what fee is 'reasonable.'" *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

▪ NRDC is a prevailing party and is eligible for a fee award because prevailing claim, Claim Ten, was a significant issue in the litigation and achieved some of the benefit plaintiffs sought in bringing the suit. Plaintiffs brought this suit to protect New York City's "drinking water supply and the health of the approximately 9 million people who depend upon it." Complaint at 1. Finding for the plaintiffs on Claim Ten, the Court ordered the EPA to take action on submitted TMDLs for ten reservoirs, which includes "5 of the 6 large West–of–Hudson reservoirs, which collectively supply on average 90% of the City's daily water supply." Affidavit of Mark A. Izeman, Esq., sworn to on June 28, 2000 [hereinafter, "Izeman Aff"]; *see also* Plaintiffs' Memorandum in Support of Application for Attorneys' Fees and Costs [hereinafter, "Plaintiffs' Memo"] at 4. By prevailing on this significant issue, NRDC achieved some of the benefit it sought when bringing the suit, and is therefore a prevailing party for attorneys' fees and costs purposes.

### II. *Loadstar*

The determination of a reasonable fee "begins with the court's calculation of a so-called 'loadstar' figure, which is arrived at by multiplying 'the number of hours reasonably expended on the litigation by a reasonable hourly rate.'" *LeBlanc–Stern-*

---

1. Although most of the cases cited by the Court involve fee-shifting statutes other than the Clean Water Act, the standards set forth in these cases apply to all fee-shifting statutes, including the Clean Water Act. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 433 n. 7, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983) ("The standards set forth in this opinion are generally applicable in all cases in which Congress has authorized an award of fees to a 'prevailing party.'"); *LeBlanc–Sternberg v. Fletcher*, 143 F.3d 748, 757 (2d Cir.1998) ("same standards are 'generally applicable in all cases in which Congress has authorized an award of fees to a prevailing party'").

*berg,* 143 F.3d at 763–64 (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)).

## A. *Number of Hours*

### 1. *Degree of Success*

The "most critical factor" to determining a reasonable fee "is the degree of success obtained." *Farrar,* 506 U.S. at 114, 113 S.Ct. 566; *Hensley,* 461 U.S. at 436, 103 S.Ct. 1933. When a plaintiff, such as NRDC, prevails on fewer than all of its claims, "two questions must be addressed. First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?" *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. The Supreme Court has instructed that "there is no precise rule or formula for making these determinations. The district court may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success. The court necessarily has discretion in making this equitable judgment." *Id.* at 437, 103 S.Ct. 1933.

"When a plaintiff has achieved substantial success in the litigation but has prevailed on fewer than all of his claims, the most important question in determining a reasonable fee is whether the failed claim was intertwined with the claims on which he succeeded." *LeBlanc–Sternberg,* 143 F.3d at 762. "No fees should be awarded for time spent pursuing a failed claim if it was 'unrelated' to the Plaintiffs' successful claims in the sense that it was 'based on different facts and legal theories.'" *LeBlanc–Sternberg,* 143 F.3d at 762 (quoting *Hensley,* 461 U.S. at 434–35, 103 S.Ct. 1933). However, when a plaintiff presents claims that "involve a common core of facts or ... [are] based on related legal theories ... making it difficult to divide the hours expended on a claim-by-claim basis," the Court should "focus on the significance of the overall relief obtained by the plaintiff

in relation to the hours reasonably expended on the litigation." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

### a. *Claims Five, Eight, and Nine*

Plaintiffs excluded time spent on Claims Five, Eight, and Nine from their request for attorneys' fees. *See* Plaintiffs' Reply Memorandum in Support of Fee Application [hereinafter, "Plaintiffs' Reply"] at 10–11. Accordingly, the Court will not address those claims in this discussion, and no fees will be awarded for time spent on those claims.

### b. *Claims One Through Four, Six, and Seven*

NRDC seeks fees and costs for time spent on Claims One, Two, Three, Four, Six, and Seven by arguing that these claims are at least partially successful claims because this lawsuit served as a "catalyst" to achieve relief. *See* Plaintiffs' Memo at 12–17; *see also* Plaintiffs' Reply at 3. The Second Circuit does recognize the "catalyst theory" and will award fees to a plaintiff "if the defendant, under pressure of the lawsuit, alters his conduct (or threatened conduct) towards the plaintiff that was the basis for the suit." *Marbley v. Bane,* 57 F.3d 224, 234 (2d Cir.1995).

In Claims One through Four, Six, and Seven, plaintiffs alleged that in the face of New York State's failure to identify threatened water bodies or to establish TMDLs for its water bodies, the EPA violated the CWA and the APA because it failed to intervene and identify the threatened water bodies and to establish the pollution limits for New York. Plaintiffs argue that these claims had a catalyst effect on the EPA, because "[t]wo months after the plaintiffs served their 60–day notice letter, New York State issued for public comment a draft list of over 800 water bodies" and "[t]wo months after the plaintiffs filed their complaint, New York submitted to EPA its final 1994 [TMDL] list, which included all nineteen New York City reservoirs." Plaintiffs' Reply at 3–4.

Plaintiffs' reliance on the catalyst theory for these unsuccessful claims is misplaced because first, the EPA did not alter its conduct with regards to any of these claims and second, because NRDC cannot establish causation.

First, the defendants did not alter their conduct towards the plaintiffs. Plaintiffs claim that this lawsuit was a catalyst because the State of New York took action. However, New York State was not a defendant in this case, and plaintiffs cannot recover fees from the EPA based upon actions taken by the State of New York. Plaintiffs argue that attorneys fees should be granted from the EPA based upon New York's actions because the "two agencies['] responsibilities are inextricably interlinked by a single statutory scheme" and because the "primary enforcement responsibility [of the CWA is] given to the state and supervisory responsibility [is] given to the federal agency." Plaintiffs' Reply at 4 n. 4. However, "when, as in this case, the party from whom fees are sought never purported to represent the entity whose behavior was influenced by litigation or its interests, the district court may not order that party to pay attorneys' fees." *Ass'n for Retarded Citizens of Connecticut, Inc. v. Thorne*, 68 F.3d 547, 552 (2d Cir.1995) (internal citations omitted).

In *Thorne*, the plaintiffs brought an action to vindicate the rights of mentally retarded residents at Mansfield Training School against various defendants, including the Department of Health Services ("DHS"). Four years into the litigation, the district court dismissed DHS from the suit. Several years later, the district court re-joined DHS to the suit, and DHS appealed the decision. The Second Circuit reversed the district court's decision to re-join DHS, but while the appeal was pending, the plaintiffs filed a motion to recover attorneys' fees. Plaintiffs included in their request time spent on the DHS appeal, arguing that they "prevailed under the catalyst theory because the litigation effected significant changes in DHS's behav-

ior, consistent with the relief it sought through litigation." *Id.* at 551. In rejecting this request, the Second Circuit explained that "[t]here is no basis in law or logic for a prevailing party to recover attorneys' fees from a party other than the entity whose behavior has been positively influenced by litigation and against whom the plaintiffs have prevailed.... Therefore, because at best plaintiffs could only be said to have prevailed as to DHS under the catalyst theory, and because the court lacked jurisdiction over DHS," no fees were awarded. *Id.* at 552–53. Similarly, here, even if New York was prompted by the first phase of claims to promulgate water quality standards, the best that can be said is that Claims One through Four, Six, and Seven were catalysts for the State of New York. Therefore, no fees for these claims can be awarded against the EPA.

The Ninth Circuit has encountered a case strikingly similar to the case at hand. In *Idaho Conservation League, Inc. v. Russell*, 946 F.2d 717 (9th Cir.1991), the plaintiffs filed a suit against the EPA alleging that the EPA violated the CWA because it failed to promulgate water quality standards on behalf of the State of Idaho. The State of Idaho subsequently entered into settlement negotiations with the plaintiffs and agreed to promulgate water quality standards, conditioned on, among other things, the dismissal of plaintiffs' suit. The EPA then approved Idaho's standards. In rejecting plaintiffs' request under the catalyst theory for attorneys' fees from the EPA, the Ninth Circuit explained that although the "State of Idaho acted to promulgate water quality standards in response to plaintiffs' suit[,][t]he party from which plaintiffs seek their fees and costs, [the EPA], was never prompted into action." *Id.* at 721. Similarly, here, although the State of New York acted to promulgate water quality standards, the EPA was never prompted into action based upon Claims One through Four, Six, or Seven. Therefore,

plaintiffs may not recover fees from the EPA based upon those claims.

Second, even if the plaintiffs could recover fees from the EPA due to the lawsuit's serving as a catalyst for New York State's action, the plaintiffs failed to establish causation as is required under the catalyst theory. Under the catalyst theory, "there must be a causal connection; that is, the lawsuit must be 'a catalytic, necessary, or substantial factor in attaining the relief.'" *Marbley,* 57 F.3d at 234 (quoting *Koster v. Perales,* 903 F.2d 131, 135 (2d Cir.1990)). Plaintiffs failed to show that this lawsuit caused New York to submit a list of threatened water bodies or a list of TMDLs. To the contrary, New York was already taking steps toward identifying the threatened water bodies and toward setting the pollution limits prior to the filing of the lawsuit. As the Court noted in *NRDC III,* "it is clear from the record that New York was actively engaged in the preparation of TMDLs as early as the mid–1980s, and maintained close communication with EPA during that time regarding its progress. The record indicates that, in addition to its substantial efforts to comply with other provisions of the Clean Water Act during the 1970s and 1980s, New York began its TMDL planning as early as 1986." 93 F.Supp.2d at 538–39. Therefore, even if the EPA could be ordered to pay fees and costs due to New York's actions, plaintiffs could not recover because they did not establish that the present lawsuit caused New York to act.

Furthermore, Claims One through Four, Six, and Seven are unrelated to plaintiff's successful claim, Claim Ten, because they are based on different facts and different legal theories. As discussed above, in the first phase of the litigation, which consisted of Claims One through Seven, plaintiffs alleged that the EPA violated the CWA and the APA by failing to act in response to New York State's inaction. These claims are unrelated to the later successful claim regarding the action the EPA took in response to New York's submission of TMDLs.

Because Claims One through Four, Six, and Seven are unsuccessful claims that are unrelated to successful Claim Ten, the plaintiffs' fee award is reduced under the "degree of success factor" such that no fees and costs associated with Claims One through Four, Six, or Seven will be awarded. All hours spent prior to the beginning of work on the Third Amended Complaint in December of 1997 are therefore excluded.

#### c. *Claims Eleven, Twelve and Thirteen*

 Unsuccessful Claims Eleven through Thirteen were intertwined with successful Claim Ten such that the Court declines to divide the hours expended on a claim by claim basis. Claims Ten through Thirteen were added in December of 1997 to complain of the EPA's treatment of eighteen TMDLs submitted by New York. These claims "involve a common core of facts" and are "based on related legal theories . . . making it difficult to divide the hours expended on a claim-by-claim basis." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933.

In Claims Ten and Eleven, plaintiffs challenged under the CWA and the APA, respectively, the EPA's treatment of the remaining ten TMDL's as "informational." *See* Third Amended Complaint. These claims had identical underlying facts and were based on related legal theories. After the Court found for the plaintiffs on Claim Ten, the court dismissed Claim Eleven "as moot, as it duplicates a claim upon which plaintiffs have already been granted relief." *NRDC III,* 93 F.Supp.2d at 560. Therefore, Claim Eleven is intertwined with Claim Ten.

In Claims Twelve and Thirteen, plaintiffs claimed that the EPA violated the CWA and the APA, respectively, by failing to "oversee and effectuate" New York's TMDL program. *See* Fourth Amended Complaint. In these remaining two claims, plaintiffs argued that the facts in-

corporated from their other claims amounted to independent claims that stood alone under the CWA and the APA. *NRDC III,* 93 F.Supp.2d at 561. The Court dismissed these claims holding that "the sum of plaintiffs' unsuccessful claims is itself an unsuccessful claim." *Id.* These claims were based in large part on the same underlying facts and legal theories as Claim Ten and are intertwined with Claim Ten.

The Court declines to reduce the loadstar hours any further due to the plaintiffs failure to prevail on Claims Eleven through Thirteen. In cases with interrelated claims, where "a plaintiff has obtained excellent results, . . . the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435, 103 S.Ct. 1933. As discussed above, with the final judgment on Claim Ten in plaintiffs' favor, the Court ordered the EPA to take action on TMDLs for ten reservoirs, which includes "5 of the 6 large West–of–Hudson reservoirs, which collectively supply on average 90% of the City's daily water supply." Izeman Affidavit. *See also* Plaintiffs' Memo at 4. As the objective of the suit was to protect the drinking water for the residents of New York City, these results are "excellent."

In sum, the Court finds that unsuccessful Claims One through Four, Six, and Seven, which constituted "Phase I" of this litigation, are unrelated to successful Claim Ten. Therefore, no fees may be awarded based on hours associated with these claims. Plaintiffs did not seek attorneys' fees for time spent on Claims Five, Eight, and Nine. Claims Ten through Thirteen, which constituted the claims within "Phase II" of the litigation for which plaintiffs are seeking fees, are intertwined. Given the excellent results NRDC achieved in Phase II, the Court will award a loadstar amount for all hours reasonably expended within Phase II of this litigation for which the plaintiffs are seeking fees. This brings Mr. Goldstein's hours to 8.75

hours in 1997, 40.75 in 1998, 79.5 in 1999, and .25 in 2000. This brings Mr. Izeman's hours to 74.75 in 1997, 211.25 in 1998, 259 in 1999, and 58.5 in 2000.

### 2. *Hours Not Reasonably Expended*

The Court must "exclude from this initial fee calculation hours that were not 'reasonably expended.'" *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933 (quoting S.Rep. No. 94–1011, p. 6 (1976)). Hours that are not reasonably expended include hours that are "excessive, redundant, or otherwise unnecessary." *Id.* at 434, 103 S.Ct. 1933. *See also LeBlanc–Sternberg,* 143 F.3d at 764 (Court should not include hours that are "excessive or duplicative"). Both NRDC attorneys, Eric A. Goldstein and Mark A. Izeman submitted detailed time sheets and deducted ten percent of their total hours for any possible duplication or inefficiency. The Court finds that neither lawyer's time sheets reflect any additional unreasonable duplication, overstaffing, or unnecessary hours.

### B. *Hourly Rates*

The hourly rate used to determine the loadstar should be based on "prevailing market rates." *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). "The loadstar figure should be in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation," *Luciano v. Olsten Corp.,* 109 F.3d 111, 115 (2d Cir. 1997), "regardless of whether plaintiff is represented by private or nonprofit counsel." *Blum,* 465 U.S. at 895, 104 S.Ct. 1541. The Court's discretion in determining the loadstar rate when plaintiff is represented by nonprofit counsel "must be exercised on the basis of rates charged to clients of private law firms." *Miele v. New York State Teamsters Conference Pension & Retirement Fund,* 831 F.2d 407, 409 (2d Cir.1987).

Plaintiffs requested different rates for each year of the litigation. *See* Affida-

vit of Stephen L. Kass, Esq., sworn to on June 28, 2000 [hereinafter, "Kass I"] at p. 11. However, the Supreme Court has instructed that the hourly rate used should be based on "current rates, rather than historical rates" so as to "compensate for the delay in payment." *Missouri v. Jenkins,* 491 U.S. 274, 283–84, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989). Therefore, the Court will assign each lawyer one hourly rate using current market rates. Because this action took place in the Southern District of New York, the market rates the Court will use are those of Manhattan lawyers with comparable skill and experience.

The two NRDC attorneys that worked on this litigation are Mr. Goldstein and Mr. Izeman. *See* Kass I at 4. Both attorneys displayed a high skill level in their submissions to the Court. Mr. Goldstein submitted an impressive resume, listing numerous published articles and teaching positions as well as cases on which he worked. *See* Kass I, Exhibit F. Mr. Goldstein graduated from Hofstra University School of Law in 1975 and received his LL.M. from New York University School of Law in 1980, *see id.,* and is "a senior attorney at NRDC." Kass I at 4. Mr. Goldstein requested an hourly rate of $320 for his work in 1994, increasing to $410 per hour for his work in 2000. *See* Kass I at 11.

Mr. Izeman graduated from New York University School of Law in 1992, clerked for the Honorable Raymond J. Pettine, Senior U.S. District Judge, in Providence, Rhode Island, and has worked at NRDC since 1993. *See* Kass I, Exhibit G. Mr. Izeman also submitted an impressive resume listing various articles he has written. Mr. Izeman requested a rate of $120 for his work in 1994, increasing to $300 per hour for his work in 2000. *See* Kass I at 11.

In support of their requested hourly rates, plaintiffs submitted National Law Journal surveys of billing rates nationwide from 1994 through 1999. *See* Kass I, Exhibit J. Plaintiffs then averaged the partner and associate hourly billing rates for the New York law firms included in the survey. The December of 1999 survey shows average partner rates as ranging between $296 and $478 and the average associate rates as ranging between $138 and $326. *See id.* However, the survey only included large law firms. In fact, only one of the twelve New York firms surveyed in 1999 has less than 200 attorneys. *See id.* The Court declines to use the rates of large New York law firms and will instead look to current small and mid-sized firm rates, as has been approved in this Circuit. *See Chambless v. Masters, Mates & Pilots Pension Plan,* 885 F.2d 1053, 1058 (2d Cir.1989) (affirming the reference to small and mid-sized firms for lodestar calculation); *see also Gavin–Mouklas v. Information Builders, Inc.,* 1999 WL 728636 *5 (S.D.N.Y. Sept.17, 1999). Partially offsetting the difference between large firms' billing rates in 1999 and small to mid-sized firms' billing rates today is the fact that most Manhattan law firms have raised billing rates since the 1999 survey was published. As the plaintiffs' evidence regarding prevailing rates is inadequate, the Court will "rely in part on the judge's own knowledge of private firm hourly rates in the community," as is common practice in this Circuit. *Miele,* 831 F.2d at 409.

■ Using current market rates, the Court determines that Mr. Goldstein, as a senior partner equivalent at a small to mid-sized firm, will be compensated at the rate of $300 per hour. The Court further determines that Mr. Izeman, as a senior associate equivalent at a small to mid-sized firm, will be compensated at the rate of $225 per hour. Therefore, plaintiffs are awarded $174,562.50 for time spent by Mr. Goldstein and Mr. Izeman in the course of the underlying litigation.[2]

---

2. This amount consists of Mr. Goldstein's bill-

ing rate of $300 multiplied by 129.25 hours

## C. *Fees for Fees Request*

NRDC requested $42,870.25 for hours spent by Carter, Ledyard and Milburn, a law firm that NRDC hired exclusively for the fee application. Although "[a] request for attorney's fees should not result in a second major litigation," *Hensley*, 461 U.S. at 437, 103 S.Ct. 1933, "[t]he fee application is a necessary part of the award of attorney's fees. If the original award is warranted, ... a reasonable amount should be granted for time spent in applying for the award." *Donovan v. CSEA Local Union 1000, American Federation of State, County and Municipal Employees, AFL–CIO*, 784 F.2d 98, 106 (2d Cir. 1986).

 NRDC claimed 124.65 hours for Carter, Ledyard and Milburn's work on the fee application. These hours represent 14.5 percent of the total time compensated. "The Second Circuit has upheld fee awards where the time spent on the fee application was up to 24% of the total time claimed ... [and][o]ther courts within this Circuit have awarded fee application awards in the range of 8 to 24 percent of the total time claimed." *Davis v. City of New Rochelle, N.Y.*, 156 F.R.D. 549, 561 (S.D.N.Y.1994) (citations omitted). The number of hours spent by Carter, Ledyard and Milburn on the fee application is within the normal acceptable realm and is reasonable.

Founded in 1854, Carter, Ledyard and Milburn is one of the oldest firms in the United States, and its lawyers are held in high esteem in the legal community. With over one hundred lawyers, Carter, Ledyard and Milburn is a mid-sized to large firm in Manhattan, and has a broad general practice. The two attorneys from Carter, Ledyard, and Milburn who worked on the fee application are Stephan L. Kass and Jean M. McCarroll. Both attorneys displayed a high skill level in their submissions to the Court, and both submitted impressive resumes. Mr. Kass graduated Cum Laude from Harvard Law School in 1964 and is a partner at Carter, Ledyard and Milburn in New York. Ms. McCarroll graduated from New York University School of Law in 1979 and is Counsel at Carter, Ledyard and Milburn. NRDC requested a billing rate of $460 per hour for Mr. Kass and $335 per hour for Ms. McCarroll. Using current market rates, the Court determines that Mr. Kass will be compensated at the rate of $350 per hour. The Court further determines that Ms. McCarroll will be compensated at the rate of $290 per hour. Therefore, plaintiffs are awarded $36,682.50 for time spent on the fee application.[3]

## III. *Expenses*

NRDC requested $10,487.71 in expenses. *See* Affidavit of Stephen L. Kass, Esq., sworn to on July 25, 2000. "Attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc–Sternberg*, 143 F.3d at 763 (quoting *U.S. Football League v. National Football League*, 887 F.2d 408, 416 (2d Cir.1989)). These recoverable expenses include "postage, photocopying, travel, and telephone costs." *Aston v. Secretary of Health and Human Services*, 808 F.2d 9, 12 (2d Cir.1986); *see also Kuzma v. I.R.S.*, 821 F.2d 930, 933–34 (2d Cir. 1987) ("photocopying, travel, and telephone costs recoverable"). NRDC's expense reports reflect that all of the requested expenses fall into recoverable categories. The Court further finds that these expenses are reasonable given the length and complexity of the litigation and NRDC's degree of success. Therefore, plaintiffs are awarded $10,487.71 in expenses.

## IV. *Conclusion*

Plaintiffs are the prevailing party in this litigation, and the defendants are hereby

---

plus Mr. Izeman's billing rate of $225 multiplied by 603.5 hours.

**3.** This amount consists of Mr. Kass's billing rate $350 times 8.9 hours plus Ms. McCarroll's billing rate of $290 times 115.75 hours.

ordered to pay the plaintiffs $221,732.71 in attorneys' fees and expenses.

SO ORDERED.